**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| WILLIAM J. L.[1], | | |
| Plaintiff, | | |
| v. | | CASE NO. 3:21-CV-338-MGG |
| COMMISSIONER OF SOCIAL SECURITY, | | |
| Defendant. | | |

**OPINION AND ORDER**

Plaintiff William J. L. ("Mr. L") seeks judicial review of the Social Security Commissioner's decision denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"). This Court may enter a ruling in this matter based on parties' consent pursuant to 28 U.S.C. § 636(b)(1)(B) and 42 U.S.C. § 405(g). For the reasons discussed below, the Court **AFFIRMS** the decision of the Commissioner of the Social Security Administration ("SSA").

I.    RELEVANT BACKGROUND

Mr. L is an army veteran who served in Iraq and was honorably discharged in 1993. Since then, Mr. L has suffered from several impairments arising from his experiences in combat, most notably posttraumatic stress order ("PTSD"). His PTSD

---

[1] To protect privacy interests, and consistent with the recommendation of the Judicial Conference, the Court refers to the plaintiff by first name, middle initial, and last initial only.

was originally evaluated by the Department of Veterans Affairs as 20% disabling upon his return from service but was later increased to 50%, and then 100% disabling.

Despite his PTSD, Mr. L worked for many years at companies supplying products for use in the RV industry. His employers valued his work and accommodated his PTSD-related symptoms as possible. By September 2019, however, Mr. L's symptoms had escalated requiring him to miss 53 days in the previous year and leading him take leave under the Family and Medical Leave Act ("FMLA") to seek additional treatment. He never returned to work. Mr. L attributed the escalation of his symptoms to changes at his company and at home, most notably the recent deployment of his son to Iraq as a member of the Army infantry—just like his dad, Mr. L.

Fortunately, Mr. L appears to be surrounded by a strong support system including his dedicated wife, who is also a nurse. Over the years, Mr. L has benefited from medical and psychological care at the Veteran's Administration while continuing to research his condition on his own. Rather than relying exclusively on allopathic treatments, Mr. L has embraced more holistic therapies, including diet, exercise, breathing, and yoga regimens, and fewer drug-related therapies to address his PTSD symptoms of irritability, obsessive compulsive behaviors, and flashbacks that are triggered by stress, light, and noise.

As Mr. L's symptoms worsened in the fall of 2019, he sought treatment and review of his veteran's disability status. As part of that process, a VA consultative psychologist, Dr. Stephanie Copeland, examined him on January 23, 2020, and completed a Disability Benefits Questionnaire ("DBQ") for submission to the VA. [DE

11 at 680–87]. On January 29, 2020, the Department of Veterans Affairs increased Mr. L's disability rating to 100% disabling effective December 20, 2019. [*Id.* at 310].

Before seeing Dr. Copeland, Mr. L had pursued medical care to address his exacerbated PTSD symptoms. At an annual physical exam by Nurse Practitioner Lensa Girsha at the V.A. on October 22, 2019, Mr. L's PTSD screening score was 2[2] indicating a negative screen for PTSD in the previous month. [*Id.* at 401]. On a referral, Mr. L consulted with Psychologist Christopher Denda on October 31, 2019, and subsequently in November and December, before agreeing to participate in cognitive processing therapy ("CPT")[3] for his PTSD.

Mr. L began his CPT with Dr. Denda on February 10, 2020, not long after Dr. Copeland's examination. At his first CPT session, Mr. L scored 50 on the PCL-5-Weekly, which means he reported severe PTSD symptoms.[4] [*Id.* at 341]. After that session, Mr.

---

[2] NP Girsha reported results of the PC-PTSD 5+I9 screen. [DE 11 at 401]. The PC-PTSD-5 screening is "a 5-item screen that was designed to identify individuals with probable PTSD in primary care settings" with the understanding that "those screening positive require further assessment . . . ." U.S. DEP'T OF VETERANS AFFAIRS, PTSD: National Center for PTSD, https://www.ptsd.va.gov/professional/assessment/screens/pc-ptsd.asp (last visited Sept. 15, 2023).

[3] CPT is "one specific type of Cognitive Behavioral Therapy" for PTSD conducted in twelve sessions of psychotherapy. U.S. DEP'T OF VETERANS AFFAIRS, PTDS: National Center for PTSD, https://www.ptsd.va.gov/understand_tx/cognitive_processing.asp (last visited May 15, 2023). "CPT teaches [the patient] how to evaluate and change the upsetting thoughts [experienced] since [the] trauma." *Id.*

[4] "The PCL-5 is a 20-item self-report measure that assesses the 20 *DSM-5* symptoms of PTSD" and allows for "[m]onitoring symptom change during and after treatment[; s]creening individuals for PTSD[; m]aking a provisional PTSD diagnosis." U.S. DEP'T OF VETERANS AFFAIRS, PTSD: National Center for PTSD, https://www.ptsd.va.gov/professional/assessment/adult-sr/ptsd-checklist.asp (last visited Sept. 15, 2023). According to Dr. Denda's treatment notes, "PCL-5 weekly has a total score range of 0–80, with higher scores indicating greater PTSD symptom severity" on the following scale:

    0–10:   no or minimal symptoms reported
    11–20:  mild symptoms reported
    21–40:  moderate symptoms reported
    41–60:  severe symptoms reported
    61–80:  very severe symptoms reported

[DE 11 at 341].

L's PTSD symptoms improved to moderate as reflected in his PCL-5 scores of 36 on February 27, 2020; 39 on March 11, 2020; and 38 on March 18, 2020. [*Id.* at 371, 438, 442]. Mr. L was scheduled for additional CPT sessions when COVID-19 hit. In a telephone conversation with Mr. L on April 16, 2020, Dr. Denda expressed his willingness to continue with remote telehealth CPT sessions in light of the V.A. COVID protocol. Mr. L refused and canceled all his CPT appointments until such time as face-to-face visits would be possible. [*Id.* at 436]. Around this time, Mr. L was also questioning the effectiveness of the CPT. [*Id.* at 65–67]. He pursued no further CPT sessions, even once in-person sessions were available.

In the meantime, Mr. L protectively filed an application for DIB on February 18, 2020, alleging a disability onset date of September 29, 2019. Mr. L's application was denied initially on April 13, 2020. As part of the initial review, a State Agency psychological consultative reviewer, Dr. Maura Clark, issued an opinion on April 9, 2020, concluding generally that Mr. L has mild and moderate limitations in some designated categories of mental functioning that would affect his ability to work but without any significant limitation in other work-related categories.

Mr. L's application was also denied upon reconsideration on August 24, 2020. As part of the reconsideration process, Dr. Clark's opinion was reviewed by another State Agency psychological consultative reviewer, Dr. Kenneth Neville. In his opinion dated July 1, 2020, Dr. Neville affirmed Dr. Clark's conclusions related to Mr. L's functional limitations and capacity. Mr. L also underwent a consultative examination by Dr. R.

Gupta on August 17, 2020, that generated a medical source statement regarding both Mr. L's physical and mental capacities for work.

After a telephonic hearing on January 12, 2021, the Administrative Law Judge ("ALJ") issued a decision on January 20, 2021, affirming the denial of disability benefits for Mr. L. In his decision, the ALJ found that Mr. L suffers from the severe impairments of PTSD, anxiety/panic attacks, and depression while noting nonsevere impairments of low back pain, high cholesterol, history of hernia repair, right Achilles repair, left elbow pain, and a history of tube thoracotomy. [*Id.* at 21]. The ALJ also determined that Mr. L does not have an impairment or combination of impairments that meet or medically equal various Listings 1.02 (major dysfunction of a joint); 1.04 (disorders of the spine); 12.04 (depressive, bipolar and related disorders); 12.06 (anxiety and obsessive-compulsive disorders); and 12.15 (trauma- and stressor-related disorders). [*Id.* at 23].

The ALJ then crafted an RFC for Mr. L, which he considered along with Mr. L's age and education, before reaching the conclusion that Mr. L is unable to perform his past relevant work in a composite job as a CNC programmer/CNC operator/supervisor but is able to work in jobs such as a laundry worker, industrial cleaner, or hospital cleaner[5], which exist in significant numbers in the national economy. [*Id.* at 30–

---

[5] In identifying these three jobs, the ALJ relied upon the testimony of the vocational expert who testified that Mr. L can perform the named jobs as classified in the Dictionary of Occupational Titles ("DOT"). [DE 11 at 87–88]. The Employment and Training Administration ("ETA") of the U.S. Department of Labor created the DOT, which has not been updated since 1991. This Court and other courts have observed that the occupations listed in the DOT are superannuated and, in many cases, antiquated if not obsolete. *See, e.g., Pamela H. v. Kijakazi,* No. 5:20-cv-00304, 2021 WL 4307457, at *6 (N.D.N.Y. Sept. 22, 2021) ("DOT definitions . . . are comically out of date."); *Karla J. v. Kijakazi,* No. 3:20-CV-1051-MGG, 2022 WL 4463347, at *5 (N.D. Ind. Sept. 26, 2022) (DOT "fails to account for minor recent inventions such as the computer and the internet" (citing *Pamela H.,* 2021 WL 4307457, at *6)); *Gass v. Kijakazi,* No. 1:19-cv-404-TLS, 2021

31]. As a result, the ALJ found Mr. L not disabled under the Social Security Act. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Mr. L's request for review on March 9, 2021. *See Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005).

Mr. L now brings his DIB claim to this Court for judicial review pursuant to 42 U.S.C § 405(g). Many policy analysts and legal observes lament shortcomings in the distribution of Social Security disability benefits. *Cf.* Lisa Rein, *Judges Rebuke Social Security for Errors as Disability Denials Stack Up*, WASH. POST, May 25, 2023, https://www.washingtonpost.com/politics/2023/05/25/social-security-disability-denials-court-remands/. However, this Court's review authority is limited and must comport with the provisions of the Social Security Act and the regulations promulgated by the Social Security Administration to implement the Act's requirements. *Cf. Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). As discussed below, the Act and relevant regulations require affirming the Commissioner's decision to deny Mr. L disability

---

WL 5446734, at *8 (N.D. Ind. Nov. 22, 2021). The ETA has replaced the DOT with the O*Net. As the number of buggy whip factory jobs has declined since the advent of the automobile, many of the jobs listed in the DOT no longer exist in significant numbers in the national and/or regional economies. The continued reliance on the DOT by the Commissioner is unsustainable, especially on the cusp of a large-scale upsurge in jobs using artificial intelligence. Continued use of occupational titles that are more than thirty years old is a grave disservice to DIB and SSI applicants and results in the unnecessary use of judicial resources as courts engage in legal contortions to review administrative decisions based on anachronistic listings. Previously, the Commissioner had announced that the DOT would be replaced with a revised "Occupational Information System" by 2020, but the roll out of the OIS has not come to fruition. The continued failure of the Commissioner to create an administrative record based on current occupational listings is cause for great concern and may have increasingly negative ramifications in social security appeals moving forward. As such, the undersigned again encourages the Commissioner to adopt the O*Net, the OIS, or another up-to-date occupational listing for use in making Step 5 determinations. Here, Mr. L's functional capacity led the VE to identify jobs with some currency thereby ameliorating, at least in this case, this Court's concerns about the antiquated nature of the job listings in the DOT.

benefits despite his factual and legal arguments as well as his honorable military service, diligent care for himself and his family since his return from service in 1993, and the challenges he has faced as the result of his service.

## II.   APPLICABLE STANDARDS

### A.   Disability Standard

To qualify for DIB, a claimant must be "disabled" as defined under the Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity [("SGA")] by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In assessing disability, the Commissioner conducts a five-step inquiry including determinations as to: (1) whether the claimant is doing SGA; (2) whether the claimant's impairments are severe; (3) whether any of the claimant's impairments, alone or in combination, meet or equal one of the Listings in Appendix 1 to Subpart P of Part 404; (4) whether the claimant can perform her past relevant work based upon her RFC; and (5) whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at every step except the fifth. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) *, as amended* (Dec. 13, 2000)

### B.   Standard of Review

The question upon judicial review is not whether the claimant is, in fact, disabled, but whether the ALJ used "the correct legal standards and the decision [was] supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *see*

7

also *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (citing *Similia v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009)). Substantial evidence is "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Put another way, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). Substantial evidence is also understood to be a term of art in administrative law. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high" in social security appeals. *Id.*

The Court reviews the entire administrative record to determine whether substantial evidence exists, but it may not reconsider facts, reweigh the evidence, resolve conflicts of evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). "[E]ven if reasonable minds could differ concerning whether [the claimant] is disabled, [the court] must nevertheless affirm the ALJ's decision denying [his] claims if the decision is adequately supported." *Elder*, 529 F.3d at 413 (internal quotations omitted). Yet, the deference to the ALJ's decision is less where the ALJ's findings contain errors of fact or logic or fail to apply the correct legal standard. *Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013). Additionally, an ALJ's decision cannot stand if it lacks evidentiary support or inadequately discusses the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). "The ALJ must confront the evidence that does not support his conclusion and support why that evidence was rejected." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). An

8

ALJ's decision will lack sufficient evidentiary support and require remand if the ALJ "cherry-picked" the record to support a finding of non-disability. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Therefore, an ALJ must—at a minimum—articulate his analysis of the record to allow the reviewing court to trace the path of his reasoning and to be assured the ALJ has considered the important evidence in the record. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). While the ALJ need not specifically address every piece of evidence in the record to present the requisite "logical bridge" from the evidence to his conclusions, the ALJ must at least provide a glimpse into the reasoning behind his analysis and the decision to deny benefits. *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001); *see also Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010).

### III.   ANALYSIS

### A.   Issues for Review

In challenging the ALJ's decision, Mr. L focuses the Court's attention on three types of errors. Mr. L argues that the ALJ erred by (1) "cherry-picking" evidence from the record to support his decision finding Mr. L not disabled; (2) failing to develop an accurate and logical bridge from the evidence to his conclusion that Mr. L is not disabled under the Act; and (3) misunderstanding the nature of mental illness, the symptoms of which wax and wane. More specifically, Mr. L argues that these three errors are evident in the ALJ's analysis of medical opinion evidence, the "B Criteria," the totality of his impairments, and his subjective symptoms. In other words, Mr. L

maintains that the ALJ's RFC determination is riddled with legal error and unsupported by substantial evidence such that remand is necessary.

Furthermore, Mr. L contends that the three occupations the ALJ identified in his Step Five analysis as jobs Mr. L can perform are incompatible with his capabilities. Mr. L's arguments regarding the ALJ's RFC analysis are addressed first.

**B.    RFC Analysis**

A claimant's RFC is based on all the evidence in his case record and reflects the most he can do in a work setting despite his severe and nonsevere, physical and mental impairments. 20 C.F.R. § 404.1545(a); *Melanie W. v. Saul*, No. 1:19CV403, 2020 WL 3056309, at *3 (N.D. Ind. June 9, 2020) ("In determining the RFC, the ALJ makes an administrative assessment of a claimant's ability to perform work-related activities on a regular and continuing basis."); *see also* SSR 96-8p, 1996 WL 374184, at *2 (S.S.A.). Evidence relevant to an RFC assessment includes objective medical evidence, medical source opinions and observations, and a claimant's statements about his limitations. 20 C.F.R. § 404.1545(a). An ALJ's RFC assessment must include a narrative discussion of how evidence supports each conclusion, cite medical facts and nonmedical evidence from the record, and discuss "why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96-8p, 1996 WL 374184, at *7; *see also Marbury v. Kijakazi*, No. 1:22-CV-034-PPS-SLC, 2023 WL 2535077, at *3 (N.D. Ind. Mar. 15, 2023). The RFC defines the functional impact of a claimant's impairments and is thus central, if not determinative,

in disability adjudications focused on whether a claimant retains the capacity to work.

*Melanie W.*, 2020 WL 3056309, at *4. According to the ALJ, Mr. L retains the RFC to

> perform a full range of work at all exertional levels but with the following
> nonexertional limitations: Would need to avoid concentrated exposure to
> loud noise, and bright/flashing lights. Mentally, the claimant is limited to
> understanding, carrying out and remembering simple instructions
> consistent with unskilled work (defined as occupations that can be fully
> learned within a short period of time of no more than 30 days, and
> requires little or no judgment to perform simple tasks), with the ability to
> sustain those tasks throughout the eight-hour workday; should not
> perform fast-paced assembly-line type of work, but can meet production
> requirements that allow him to sustain a flexible and goal oriented pace;
> the ability to use judgment in making work-related decisions is limited to
> making only simple work-related decisions; changes in terms of use of
> work tools, work processes, or work settings and if there are workplace
> changes, they are introduced gradually; only superficial interactions with
> supervisors, coworkers, and the general public, defined as occasional and
> casual contact with no prolonged conversations and contact with
> supervisors is short but allows the supervisors to give instructions; need
> to avoid contact with large groups of people; and no work involving
> traveling to unfamiliar places or using public transportation.

[*Id.* at 24–25].

### 1.   Medical Opinion Evidence

Mr. L objects to the ALJ's analysis of the medical opinions in the record[6]

regarding both his mental and physical limitations. Generally, Mr. L argues that the ALJ

selectively considered the medical opinions in this case then relied upon his own lay

---

[6] Medical opinions and prior administrative findings are distinct categories of evidence defined in the
Social Security regulations. 20 C.F.R. § 404.1513(a)(2), (5). Both contain opinions of medical sources
regarding a claimant's impairments and ability to work. Prior administrative findings are distinctive
because they are made by State Agency medical and psychological consultants at the initial and
reconsideration levels of review while a medical opinion can be from any medical source—often a
claimant's treating source—generated at any time prior to the Commissioner's disability decision.
Throughout this Opinion and Order, the Court will use the general term "medical opinion" when
referencing both medical opinions and prior administrative medical findings because the regulations
require ALJs to use the same legal standard when evaluating both categories of opinion evidence. *See* 20
C.F.R. § 404.1513(a).

interpretation of the evidence to support his conclusions leading to an RFC. More specifically, Mr. L contends that the ALJ relied too heavily on the opinions of the State Agency psychological consultants, Drs. Clark and Neville, in defining Mr. L's mental RFC. Mr. L then accuses the ALJ of "playing doctor" by evaluating the opinion of VA consultative examiner, Dr. Copeland, himself without the benefit of any expert opinion interpreting the meaning of her opinion. Mr. L acknowledges that the ALJ included greater limitations in the mental RFC than those opined by Drs. Clark and Neville but contends that even those more extensive limitations are insufficient and unrooted in the evidence of record. Lastly, Mr. L maintains that the ALJ's physical RFC determination allowing for work at all exertional levels, and derived from the State Agency medical consultants' opinions, failed to account for Mr. L's physical limitations.

### a.      State Agency Psychological Consultant Opinions

Mr. L's records were reviewed on April 9, 2020, by State Agency consultative psychologist, Dr. Clark, as part of the initial disability application process and then affirmed by Dr. Neville in July 2020 as part of the reconsideration process. Dr. Clark's report explicitly discussed Mr. L's April 2019 chest CT scan, December 2019 mental status exam, and his first two CPT sessions with Dr. Denda in February 2020. [DE 11 at 95]. The record before Dr. Clark also included March 2020 function reports from Mr. L and his wife. Neither Dr. Clark nor Dr. Neville reviewed any medical opinion evidence noting that Mr. L's record included "no indication that there is a medical opinion from any medical source." [*Id.* at 97, 110]. Thus, Drs. Clark and Neville did not review Dr.

Copeland's January 2020 DBQ or Dr. Denda's records from Mr. L's last two CPT

sessions in March 2020.

Based on this record, Dr. Clark found that Mr. L had mild limitations in his

ability to understand, remember, or apply information; and moderate limitations in

interacting with others; concentrating, persisting, or maintaining pace; and adapting or

managing oneself. [*Id.* at 96]. Dr. Clark's Mental Residual Functional Capacity

("MRFC") Assessment indicated that Mr. L was not significantly limited in many

functional categories but was moderately limited in his ability to (1) complete a normal

workday and workweek without interruptions from psychologically based symptoms

and perform at a consistent pace without an unreasonable number and length of rest

periods; (2) interact appropriately with the general public; (3) get along with coworkers

or peers without distracting them or exhibiting behavioral extremes; (4) respond

appropriately to changes in the work setting; and (5) travel in unfamiliar places or use

public transportation. [*Id.* at 97–99]. Dr. Clark ultimately concluded that Mr. L was not

disabled and retained the MRFC to "understand, carry out and remember simple

instructions; . . . make judgments commensurate with functions of simple, repetitive

tasks; . . . respond appropriately to brief supervision and interactions with coworkers

and work situations; [and] deal with changes in a routine work setting." [*Id.* at 99–100].

Dr. Neville affirmed Dr. Clark's conclusions noting that Mr. L "does not allege

worsening or changes." [*Id.* at 108–11].

When considering medical opinion evidence in a claimant's record, ALJs do not

assign any particular evidentiary weight to the opinions but are directed to articulate

the persuasiveness of all opinions in the record. 20 C.F.R. § 404.1520c(a)–(b). ALJs

determine how persuasive a medical source opinion is by analyzing the extent to which

the opinion is supported by objective medical evidence and the medical source's

explanations; the opinion's consistency with other evidence in the record; the nature of

the relationship between the medical source and the claimant; the medical source's

professional specialization; and other factors detailed in the regulations. *Id.* at

§ 404.1520c(c). The supportability and consistency factors are the most important and

must be addressed by the ALJ. *Id.* at § 404.1520c(b)(2).

Here, the ALJ found Dr. Clark's and Dr. Neville's assessment "persuasive and

supported by objective evidence in the record at the time of review as well as

subsequent clinical reports . . . ." [DE 11 at 29]. The ALJ incorporated the mental

limitations defined by Drs. Clark and Neville into Mr. L's RFC and explained that he

added restrictions to account for Mr. L's testimony related to stress, anger, irritability,

distrust, panic attacks, his dislike of crowds and dealing with people, and the triggering

of his PTSD symptoms by light and noise. [*Id.*]. Mr. L maintains that the ALJ

overestimated the persuasiveness of Clark and Neville's opinions because they were

based on an "outdated and incomplete" record that did not include Dr. Copeland's

opinion or the complete range of Dr. Denda's treatment records.

"It is appropriate for an ALJ to rely on the opinions of physicians and

psychologists who are also experts in social security disability evaluation. " *Flener ex rel.

Flener v. Barnhart,* 361 F.3d 442, 448 (7th Cir. 2004); *see also* 20 C.F.R. § 404.1513a(b)(1).

However, a State Agency consultant's opinion is not persuasive solely based on his

14

expertise and experience evaluating Social Security disability claimants. *See Giacchetti v. Berryhill*, No. 16 C 5055, 2017 WL 1731715, at *7 (N.D. Ill. May 2, 2017). "An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), *as amended on reh'g* (Apr. 13, 2018).

Here, no one disputes that Dr. Copeland's January 2020 DBQ, prepared for the V.A.'s review of Mr. L's disability rating, was not reviewed by Dr. Clark or Dr. Neville. And no one disputes that Mr. L exhibited serious PTSD symptoms[7] during Dr. Copeland's consultative examination that led her to check a box on the DBQ form stating that Mr. L suffers from "[t]otal occupational and social impairment." [DE 11 at 682, 685]. However, Dr. Copeland's DBQ was prepared before Drs. Clark and Neville reviewed Mr. L's records. Thus, the DBQ likely does not qualify as "later evidence." Moreover, Mr. L has not established that Dr. Copeland's DBQ constitutes "new, significant medical diagnoses" that "reasonably could have changed" Dr. Clark's and Dr. Neville's opinions. *See Moreno*, 882 F.3d at 728.

First, Dr. Copeland diagnosed Mr. L with PTSD, which was not a new medical diagnosis in January 2020. Second, while Dr. Copeland documented new, acute symptoms that might have been significant enough to change Dr. Clark's and Dr. Neville's opinions, Drs. Clark and Neville reviewed Mr. L's records from before and

---

[7] As Dr. Copeland explains in the DBQ, she was about 15 minutes late to Mr. L's appointment, which caused him considerable stress resulting in large welts on his neck and head, attempted use of "grossly inappropriate" relaxation techniques, hyperventilation, memory loss, dissociation, shifting in his seat and scanning the door. [*Id.* at 685]. Having witnessed these symptoms firsthand, Dr. Copeland reported a long list of potentially debilitating symptoms in confirming his PTSD diagnosis.

after Dr. Copeland's DBQ and found no examples of similarly severe symptoms. Mr. L's records undisputedly, and consistently, include observations of anxiety with some psychomotor agitation but otherwise normal mental status exam findings over time as noted by the ALJ. [*See* DE 11 at 27–28, 30]. Further, Mr. L's symptoms improved after his CPT sessions with Dr. Denda as evidenced by his PCL-5 score, which improved from 50 at his first session on February 10, 2020, to 36 at his second session on February 27, 2020. [*Id.* at 341, 371]. The ALJ accounted explicitly for this improvement in his decision. [*Id.* at 28]. No other medical evidence reflects episodes as extreme as what Dr. Copeland observed in January 2020. PTSD symptoms do fluctuate—often wildly—but Mr. L points to nothing establishing that Mr. L's symptoms are consistently as severe as observed by Dr. Copeland. Thus, Mr. L has not shown that Drs. Clark and Neville would have reasonably changed their opinions even if they had reviewed Dr. Copeland's DBQ or Dr. Denda's March 2020 records.

Nevertheless, Mr. L contends that Drs. Clark and Neville did not have a longitudinal view of Mr. L's condition because they did not review Dr. Copeland's DBQ. In support, Mr. L directs the Court's attention to his hearing testimony about his PTSD symptoms going "downhill" since his return from service, occurring daily, and only abating partially if he maintains a methodical routine as evidence that any improvement was not sustained. Mr. L also emphasizes that his symptoms forced him to miss 53 days of work in the year before he stopped working and that any improvement he experienced in treatment was not enough to allow him to engage in substantial gainful activity. As discussed above, however, Dr. Copeland's DBQ

16

reported symptoms dramatically inconsistent with the rest of the record. Even Mr. L's hearing testimony does not describe symptoms as severe as Dr. Copeland observed. Moreover, Mr. L's reliance on having missed 53 days of work before he stopped working and started treatment is misplaced as he presents no additional evidence to demonstrate that he would have to miss a comparable number of days per year in the future. Therefore, while Drs. Clark and Neville may have reviewed an incomplete record, the record created a longitudinal picture of Mr. L's condition and functional limitations even without reference to Dr. Copeland's DBQ.

### b.     Dr. Copeland's DBQ

With that said, neither Mr. L's extreme symptoms during the Copeland examination nor Dr. Copeland's assessment reflected in the DBQ can be ignored. After all, the ALJ must consider all the evidence of record in assessing Mr. L's RFC. *See* 20 C.F.R. § 404.1545(a)(3); *Cervantes v. Kijakazi*, No. 20-3334, 2021 WL 6101361, at *2 (7th Cir. Dec. 21, 2021). And the ALJ did just that.

After explaining why he found the opinions of Drs. Clark and Neville persuasive and how their opinions contributed to his RFC determination, the ALJ prepared to analyze Dr. Copeland's DBQ by confronting the legal distinctions between disability ratings by the Department of Veterans Affairs and disability as defined under the Social Security Act for purposes of DIB. [DE 11 at 29–30].  Social Security regulations expressly state that decisions of other governmental agencies, including the Department of Veterans Affairs, do not bind the agency as it determines whether a claimant is disabled and entitled to benefits. 20 C.F.R. § 404.1504. Thus, the ALJ properly explained that he

was required to independently determine if Mr. L is "disabled" under the Act. *See*

*Clifford*, 227 F.3d at 874.

The ALJ then turned to Dr. Copeland's DBQ, which he referred to as her

"diagnostic summary," explicitly noting her conclusion that Mr. L's PTSD resulted in

"[t]otal occupational and social impairment." [DE 11 at 30]. In discussing Dr.

Copeland's DBQ, the ALJ found Dr. Copeland's behavioral observations of Mr. L and

her diagnostic summary to be based on his own reports and not persuasive. [*Id.*]. He

compared Dr. Copeland's comments about Mr. L's January 2020 exam to other

treatment records but concluded that those records did not display such extreme

symptoms before or after the Copeland exam.

In assessing the persuasiveness of Dr. Copeland's DBQ, the ALJ gave Mr. L the

benefit of the doubt by reviewing the DBQ consistent with the requirements for

reviewing medical opinion evidence. As the Commissioner suggests, Dr. Copeland's

DBQ likely fails to qualify as medical opinion evidence. Under 20 C.F.R. § 404.1513(a), a

" 'medical opinion' is distinct from 'objective medical evidence,' which concerns

'medical signs, laboratory findings, or both.'" *Jason M. v. Kijakazi*, No. 1:20-CV-03121-

MG-SEB, 2022 WL 2071096, at *5 (S.D. Ind. June 9, 2022) (quoting § 404.1513(a)(1)). To

qualify as a medical opinion, a statement in the record must satisfy two elements: (1) it

must be a statement from a medical source explaining what a claimant could still do

despite his limitations; and (2) it must express the claimant's impairment-related

limitations or restrictions in terms of his ability to perform certain work demands.

*Wallender v. Saul*, No. 20-CV-808-SCD, 2021 WL 734098, at *6 (E.D. Wis. Feb. 25, 2021);

*see also* 20 C.F.R. § 404.1513(a)(2). Without these elements, evidence is not considered a medical opinion, and an ALJ has no duty to examine or evaluate the persuasiveness of such evidence using the factors in 20 C.F.R. § 404.1520c. *Jason M.*, 2022 WL 2071096, at *5 (citing *Kernstein v. Kijakazi*, 2021 WL 5356103, at *3 (N.D. Ind. Nov. 17, 2021))

Here, Dr. Copeland used the DBQ form designed as part of the V.A. disability review process. The DBQ form asks questions specific to the standards applicable to V.A. disability decisions but does not address a claimant's functional capacity despite impairment-related limitations in terms of his ability to perform particular work tasks. *See* 20 C.F.R. § 404.1513(a)(2). Therefore, a V.A. DBQ is unlikely to ever qualify as a medical opinion under Social Security standards.

More specifically, Dr. Copeland's indication that Mr. L suffers from "Total occupational and social impairment" does not address the functional limitations on Mr. L's ability to work. Thus, the statement does not qualify as a "medical opinion"[8] under the operative Social Security statutes and regulations. Furthermore, statements like Dr. Copeland's that declare a claimant is disabled or unable to work are neither valuable nor persuasive to an ALJ's disability determination. *See* 20 C.F.R. § 404.1520b(c)(3)(i). The question of whether a claimant is disabled is reserved to the Commissioner of Social Security who is responsible for making that determination consistent with the applicable Social Security statutes and regulations. *Id.* As a result, Dr. Copeland's

---

[8] As defined by the Social Security regulations, a "medical opinion" describes what an individual can still do despite his impairments and whether he has one or more impairment-related limitations or restrictions identified in that regulation. 20 C.F.R. § 404.1513(a)(2).

disability conclusion in the DBQ—relevant to the V.A. disability rating process—was not entitled to any consideration here even if the DBQ as a whole were deemed a "medical opinion."

Nonetheless, the ALJ evaluated the persuasiveness of Dr. Copeland's DBQ as if it were medical opinion evidence. Despite Mr. L's contention to the contrary, the ALJ built a logical bridge to her conclusion that Dr. Copeland's DBQ was not persuasive by acknowledging evidence favorable and not favorable to Mr. L. The ALJ acknowledged the exacerbated symptoms Dr. Copeland observed in January 2020 then compared them both to Mr. L's own reports as well as other objective medical evidence in the record.

### c.    "Playing Doctor" with Dr. Copeland's Opinion

Mr. L's argument that the ALJ "played doctor" by evaluating Dr. Copeland's DBQ when no expert had reviewed it is no more persuasive. Mr. L asserts that, as the State Agency doctors didn't review Copeland opinion, the ALJ was reviewing Dr. Copeland's opinion without any expert opinion in the record regarding the meaning of that opinion and was therefore impermissibly "playing doctor."

While it is the responsibility of the ALJ to making findings "about what the evidence shows," 20 C.F.R. § 404.1520b, "playing doctor" is "a clear no-no." *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014). An ALJ plays doctor where he "substitute[s] his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Clifford*, 227 F.3d at 870. ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves." *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014).

Here, the ALJ found that Dr. Copeland's behavioral observations and statement of total occupational and social impairment were based on "the claimant's own reports." [DE 11 at 30]. Accordingly, the ALJ found that a psychologist's opinion relying on the subjective complaints of the claimant was unpersuasive not only because it was based on subjectivity but also because it was not accompanied by objective treatment records and did not account for the totality of medical evidence. [*Id*.].

The issue raised by Mr. L is reminiscent of *Prill v. Kijakazi*, 23 F.4th 738, 750–51 (7th Cir. 2022). In *Prill*, the Seventh Circuit found that the ALJ adequately explained why she discounted a treating physician's opinion.[9] The ALJ found that the doctor's opinion was internally inconsistent, inconsistent with the objective medical evidence in the record, and failed to provide objective exams or diagnostic testing to support the limitations he opined were necessary. *Id.* at 751. Thus, in *Prill*, the ALJ was entitled to give the doctor's opinion less weight. *Id.* (*citing* 20 C.F.R. § 404.1527(c)(4)); *see also Desotelle v. Kijakazi*, No. 22-1602, 2023 WL 4146246, at *3 (7th Cir. June 23, 2023) (finding that the ALJ did not "play doctor by substituting her own interpretation of the medical evidence in place of a medical expert" when it was reasonable for the ALJ to find that the treating physician's opinion report was left largely blank, including the earliest date

---

[9] In *Prill*, the court evaluated the medical opinion evidence in compliance with 20 C.F.R. § 404.1527, which applied to disability claims filed before March 27, 2017. Under that regulation, a treating physician's opinion was ordinarily entitled to controlling weight unless it was unsupported by medical findings or inconsistent with the record. 20 C.F.R. § 404.1527(c)(2). While the "treating physician rule" does not apply in Mr. L's case and Dr. Copeland was not providing treatment to Mr. L, the subjective statements in her DBQ report need not be ignored completely. *Cf. Adaire v. Colvin*, 778 F.3d 685, 688 (7th Cir. 2015).

when the work limitation commenced, and was otherwise inconsistent with the objective medical evidence and other medical opinions).

Likewise, here, the ALJ credited other evidence over Dr. Copeland's opinion after finding that Dr. Copeland's opinion was inconsistent with and unsupported by the record and based on the subjective reports of Mr. L. As the ALJ observed, "[t]he treatment records do not note such extreme symptoms at other time prior or subsequent to this one-time evaluation and mental status examinations during the relevant period mostly show the claimant with some anxiousness and psychomotor agitation at time but otherwise psychological function [is] within normal limits." [DE 11 at 30].

Thus, even if the ALJ erred by not submitting Dr. Copeland's opinion to expert review, such an error was harmless. The record includes nothing to corroborate Mr. L's extreme symptoms over time or to establish that those extreme symptoms could "be expected to last for a continuous period of not less than twelve months." *See* 42 U.S.C. § 423(d)(1)(A). Moreover, Mr. L has not identified specific restrictions to his ability to work that Dr. Copeland's opinion supports. *See Cervantes*, 2021 WL 6101361, at *3.

### d.    Additional MRFC Limitations

Mr. L. asserts that the ALJ implicitly found the consultative opinions of Drs. Clark's and Neville outdated because the ALJ's RFC imposed greater mental limitations on Mr. L than they opined. Mr. L then argues that those additional limitations still do not account for the full effect of his PTSD on work and are unrooted in the evidence. Mr. L's argument is misplaced.

These additional limitations were grounded in Mr. L's testimony at the telephonic hearing on January 12, 2021. [*Id.* at 37–91]. Mr. L testified that his PTSD manifests through daily flashbacks to horrific war experiences in Iraq, often triggered by lights because the original events occurred at night when he was using night vision goggles. [*Id.* at 53]. According to Mr. L, these issues have caused him to avoid driving at night. [*Id.*]. He also testified that loud noise would trigger his PTSD [*Id.* at 54–55]. Furthermore, Mr. L explained that he becomes overwhelmed by stress; is very emotional; trusts no one; yells at people often; and confines himself to home. [*Id.* at 55–57]. Mr. L also stated that he only survives when he is overwhelmed and angry by keeping a methodical routine. [*Id.* at 57].

Taking into consideration Mr. L's testimony, the ALJ created an RFC that both included the limitations discussed by Drs. Clark and Neville and additional restrictions linked to Mr. L's testimony. [DE 11 at 29]. Specifically, the ALJ crafted Mr. L's RFC with the nonexertional limitation that he "[w]ould need to avoid concentrated exposure to loud noise and bright/flashing lights" and further limited him to "only superficial interactions with supervisors, coworkers, and the general public [and avoiding] contact with large groups of people." [*Id.*].

As a result, these additional limitations were not unrooted or speculative, and were, in fact, supported by the record. To that point, the RFC developed by the ALJ was not only based on the medical evidence and testimony in the record but was also more favorable to Mr. L. This type of RFC has been approved in similar situations. *See, e.g.*, *Taylor v. Kijakazi*, No. 21-1458, 2021 WL 6101618, at *3 (7th Cir. Dec. 22, 2021) (affirming

23

an ALJ's RFC determination that included a restriction that "was more favorable than perhaps the medical evidence alone would have permitted"); *cf. Lanigan v. Berryhill*, 865 F.3d 558, 565 (7th Cir. 2017) (finding it impermissible for an ALJ to use a hypothetical that includes assumptions about claimant's RFC that are unsupported by the record).

If anything, the record shows that the ALJ gave Mr. L the benefit of the doubt in crafting his RFC. As such, the ALJ did not err by adding restrictions beyond those opined by Drs. Clark and Neville into Mr. L's RFC.

### e.  Physical Limitations in RFC

Mr. L also contends that the ALJ erred by crafting an RFC allowing work at all exertional levels given his physical impairments. Mr. L argues that his breathing condition, confirmed by a CT scan in April 2019, causes shortness of breath upon exertion, which would affect his ability to work at some exertional levels. Additionally, Mr. L notes that his shortness of breath would also affect his ability to control symptoms arising from his PTSD and related panic attacks because he uses breathing techniques in those situations. Mr. L also contends that his pain and other physical impairments, including elbow pain, disc degeneration, hernia repair, and Achilles' tendon impairment, interfere with his activity, sleep, mood, and stress, which in turn affect his ability to work. Thus, Mr. L challenges the ALJ's failure to incorporate any limitations for his physical impairments into his RFC.

As undeveloped arguments are waived, Mr. L arguably waived his opportunity to have the effect of his physical impairments considered in his Social Security disability application by failing to raise them—even explicitly requesting they not be considered.

*Cf. Handford ex rel. I.H. v. Colvin*, 2014 WL 114173, at *11 (N.D. Ill. 2014) (applying *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1992) in a social security appeal). At his hearing before the ALJ, Mr. L's attorney was explicitly asked whether Mr. L would be "pursuing physical impairments." [DE 11 at 50]. Counsel responded: "No, Your Honor. It really is, it's his PTSD issue." [*Id.*]. In his Disability Report, Mr. L only listed PTSD, Anxiety, and Panic in response to the question asking him to "[l]ist all of the physical or mental conditions . . . that limit [his] ability to work.' [*Id.* at 230]. Thus, the ALJ stated in his decision that Mr. L "did not allege any physical impairments when he applied for disability benefits." [DE 11 at 21].

"[W]hen there is no allegation of a physical . . . limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8P, 1996 WL 374184, at *3. The ALJ's decision reflects his consideration of Mr. L's case record with regard to his physical impairments. First, the ALJ described Mr. L's physical impairments and found them to be nonsevere. [DE 11 at 21–22]. In support, the ALJ discussed and found persuasive the opinion of Dr. Gupta, who conducted a consultative physical examination of Mr. L in August 2020 and opined that he "is able to do work related activities such as sitting, standing, walking, lifting, carrying and handling objects[; is] able to hear, see and speak normally[; and] understand with normal concentration, memory, and social interactions." [*Id.* at 22, 504]. The ALJ also mentioned another August 2020 State Agency medical consultant's assessment of Mr.

L's physical impairments even though that same consultant noted that Mr. L "does not allege any physical issues . . ." [*Id.* at 22–23, 107–08]. Second, the ALJ analyzed Mr. L's impairments to see if they met or medically equaled any of the listed impairments at Step Three. [*Id.* at 23].

The ALJ thereby satisfied his obligation to consider all of Mr. L's impairments, including his nonsevere physical impairments, before crafting Mr. L's RFC. *See* 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *2.

### 2.    Mental Limitations—"Paragraph B" Criteria Analysis

At steps two and three of the five-step evaluation,[10] the ALJ uses a special technique to evaluate mental impairments. *See* SSR 96–8p, 1996 WL 374184. The special technique determines whether a claimant has a medically determinable mental impairment and whether that impairment causes functional limitations. *See* 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's "pertinent symptoms, signs, and laboratory findings" to determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). If the claimant has a medically determinable mental impairment, then the ALJ rates[11] the degree of functional limitation in four broad areas: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. *Id.* §

---

[10] The limitations in the Paragraph B and C criteria "are not an RFC assessment" and at Step Four the ALJ is required to provide "a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF." SSR 96-8p, 1996 WL 374184, at *4; *see also* *Powell v. Kijakazi,* No. 21-CV-01160-JES-JEH, 2023 WL 2653358, at *4 (C.D. Ill. Mar. 27, 2023).

[11] These functional areas are rated on a five-point scale of none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4).

404.1520a(c)(3). These functional areas are known as the "B criteria." *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 et seq. If the impairment is deemed severe, the ALJ must determine whether it meets or is equivalent in severity to a listed mental disorder. *Id.* § 404.1520a(d)(2). Where the mental impairment does not meet or equal any listing, the ALJ will then assess the claimant's RFC. *Id.* § 404.1520a(d)(3). Here, the ALJ found that Mr. L has medically determinable mental impairments that are severe. In assessing whether Mr. L's severe mental impairments meet or equal a Listing, the ALJ conducted the requisite Paragraph B analysis to determine "the degree of [Mr. L's] functional limitation based on the extent to which [his] impairment(s) interferes with [his] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.* § 404.1520a(c)(2).

In analyzing the Paragraph B criteria, the ALJ must incorporate "a specific finding as to the degree of limitation in each of the functional areas." *Id.; see also Craft v. Astrue*, 539 F.3d 668, 674–75 (7th Cir. 2008); *Timothy H. v. Kijakazi*, No. 20 C 581, 2022 WL 4079433, at *3 (N.D. Ill. Sept. 6, 2022). The ALJ's analysis must cite evidence that supports his conclusion regarding each functional area. *Timothy H.*, 2022 WL 4079433, at *3. To satisfy the paragraph B criteria, the claimant must establish "extreme" limitation of one, or "marked" limitation of two, of the four functional areas. 20 C.F.R. Pt. 404, Subpt. P, App. 1. § 12.00(A)(2)(b). However, the findings at Step Three regarding the Paragraph B criteria "are not an RFC assessment. SSR 96-8p, 1996 WL 374184, at *4. The subsequent RFC analysis must include "a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the

27

adult mental disorders listings in 12.00 of the Listing of Impairments . . . ." *Id.*; *see also Powell v. Kijakazi*, No. 21-CV-01160-JES-JEH, 2023 WL 2653358, at *4 (C.D. Ill. Mar. 27, 2023).

In the ALJ's Step Three Listing analysis here, the adopted Drs. Clark and Neville's opinion that Mr. L. has a mild limitation in understanding, remembering, or applying information with moderate limitation in (1) interacting with others, (2) concentrating, persisting, or maintaining pace, and (3) adapting and managing himself. [DE 11 at 24]. Mr. L is not satisfied with the ALJ's Paragraph B analysis arguing that it cannot be accurate because the ALJ crafted a more restrictive RFC at Step Four. Mr. L also argues that the ALJ's Paragraph B analysis is flawed citing assorted evidence in the record in an attempt to show that Mr. L is more limited that the ALJ concluded in analyzing the four Paragraph B functional areas.

Despite Mr. L's argument, the ALJ's Paragraph B analysis is not improper just because his discussion of the same functional areas in the RFC section of his decision was more detailed. After all, the regulations describe the RFC assessment as including a more detailed consideration of the broad Paragraph B categories. *See* SSR 96-8p, 1996 374184, at *4. Moreover, the ALJ's RFC assessment merely expands the discussion of the four functional areas without contradicting the Paragraph B analysis in Step Three.

The ALJ's analysis of each of the four functional areas throughout his opinion is not flawed either. In challenging the mild and moderate ratings the ALJ attached to each of the four functional areas, Mr. L directs the Court's attention to considerable evidence in the record in an attempt to show that the ALJ failed to develop a logical

bridge to his conclusions. *See Zurawski*, 245 F.3d at 889. Yet the ALJ is not required to address every piece of evidence in the record. *O'Connor-Spinner*, 627 F.3d at 618. All that Mr. L has shown through his emphasis on certain parts of the record is that he disagrees with how the ALJ assessed the totality of the record before him in determining how to rate his abilities in the four functional areas in the Paragraph B criteria. This is clearly an invitation to the Court to reweigh the evidence and reach a different conclusion than the ALJ did. The Court cannot accept that invitation, especially here where the ALJ has adequately supported his conclusions. *See Young*, 362 F.3d at 1001; *Elder*, 529 F.3d at 413.

### 3.   Subjective Symptom Analysis

Next, Mr. L raises several challenges to the ALJ's subjective symptom analysis. When crafting a claimant's RFC, an ALJ must follow a two-step sequential process to determine whether a claimant's "symptoms can be accepted as consistent with objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). First, the ALJ must determine whether there are underlying medically determinable mental or physical impairments that could reasonably be expected to produce the claimant's pain or symptoms. *Id.* Second, if there are underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms, the ALJ must then evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. *Id.* The ALJ evaluates the intensity, persistence, and limiting effects of symptoms by considering subjective statements about symptoms and pain, as well as

any description medical sources and other nonmedical sources provide about how these symptoms affect a claimant's ability to work. *Id.*

This analysis must focus on the extent to which the symptoms reduce the individual's capacity to perform work-related activities. *Wade v. Berryhill*, No. 2:17-CV-278, 2018 WL 4793133, at *10 (N.D. Ind. Oct. 4, 2018) (citing SSR 16-3p). The ALJ must also consider the existence of any inconsistencies in the evidence and the extent to which there are any conflicts between a plaintiff's statements and the evidence in the record. 20 C.F.R. § 404.1529(c)(4). Accordingly, a claimant's alleged symptoms are determined to diminish their capacity to work "to extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical and other evidence." *Id.* So long as the ALJ gives specific reasons supported by the record, the Court will not overturn this determination unless it is "patently wrong." *See Deborah M. v. Saul*, 994 F.3d 785, 789 (7th Cir. 2021).

It is undisputed that Mr. L's symptoms could be caused by his severe impairment of PTSD. Accordingly, the ALJ proceeded to analyze the evidence to determine the intensity, persistence, and limiting effects of Mr. L's symptoms and the extent to which they are consistent with the record as a whole. The ALJ considered Mr. L's own testimony, reports and testimony of other nonmedical sources such as his wife and his supervisor Capello, objective medical evidence, and medical opinion evidence.

As a preliminary matter, Mr. L asserts in his brief that the ALJ's decision followed a "disconcerting trend" of assuming that Mr. L was being untruthful. [DE 15

at 24]. Based on this "assumption," Mr. L asserts that the ALJ placed an unacceptable burden on Mr. L to demonstrate his disability in contravention of *Roberta F. v. Saul*, No. 1:20 cv 63, 2021 WL 321447, at *10n.4 (N.D. Ind. Feb. 1, 2021). While this argument is not fully developed,[12] it implies that the ALJ ignored certain evidence in arriving at his decision. Yet, contrary to Mr. L's assertion, nothing in the ALJ's decision suggests that he assumed Mr. L was being untruthful, which would indeed be concerning if true. Rather, the ALJ demonstrated considerable deference to Mr. L's stated symptoms by adding limitations to his RFC directly accounting for the symptoms outlined in his testimony and consistent with the reports of his wife and his former employer.

According to Mr. L, the ALJ failed to explain why he did not fully credit the opinions of the consultant psychologists, Drs. Clark and Neville, regarding the intensity, persistence, and functional limitations of Mr. L's symptoms. [DE 15 at 24]. In support, Mr. L relies upon *Jayson J. v. Saul,* No. 2:19 cv 175, 2020 WL 597657, at *13–14 (N.D. Ind. Feb. 7, 2020) for the proposition that, where findings of alleged intensity, persistence, and limiting effects are substantiated by objective medical evidence *alone*, the claimant is disabled without any further analysis. Here, Drs. Clark and Neville both answered affirmatively the standard question: "Are the individual's statements about the intensity, persistence, and functionally limiting effects of the symptoms substantiated by the objective medical evidence alone?" [DE 11 at 97, 109]. However,

---

[12] Typically, undeveloped arguments are considered waived. *Berkowitz,* 927 F.2d at 1384; *Handford ex rel. I. H.,* 2014 WL 114173, at *11. As Mr. L's argument implicates the proper weighing of evidence by the ALJ, the Court will consider it on the merits.

contrary to Mr. L's assertion, nothing in 20 C.F.R. § 404.1529 and SSR 16-3p, cited in *Jayson J.* and providing guidance on the evaluation of symptoms in disability claims, requires a finding of disability based on one part of a State Agency's consultant's report. *See also Michelle P. v. Kijakazi,* No. 1:21-cv-02529-JRS-DLP, 2022 WL 17581809, at *7 (S.D. Ind. Sept. 26, 2022) (comparing the Court's statement in *Jayson J.* to SSR 16-3p and 20 C.F.R. § 404.1529 and finding that "[n]either the cited ruling or regulation expressly states that the medical consultant's relevant finding concludes the disability determination and directs a finding of disability."). Mr. L points to no such authority either. After all, one statement of a consultative psychologist should not "trump[] the ALJ's duty to consider all the categories of evidence in assessing the [claimant's] subjective symptoms." *Hebein v. Kijakazi,* CAUSE NO.: 3:21-CV-880-TLS-MGG, 2023 WL 2583267, at *4 (N.D. Ind. Mar. 21, 2023).

Of course, the ALJ cannot ignore evidence that supports a claimant's statements about the intensity, persistence, and limiting effects of his symptoms. *See id.* Mr. L contends that the ALJ did just that by failing to acknowledge Drs. Clark and Neville's "substantiated by medical evidence alone" statements. Yet those statements alone cannot dictate a disability determination without analysis of the other evidence in the record. With that said, Mr. L also argues that the ALJ's decision reflects a myopic focus on normal objective medical evidence, overreliance on Mr. L's conservative treatment, and improper discounting of his good work history. After describing the ALJ's allegedly incomplete consideration of the record, Mr. L concludes that the ALJ did not adequately explain why he credited some of his statements about the intensity,

persistence and limiting effects of his symptoms over others or why he determined that the evidence he cited was outweighed by other evidence.

A close review of the ALJ's decision does not match Mr. L's assessment. The ALJ concluded that "the record as a whole demonstrates a greater level of psychological function than the claimant alleges" after a lengthy and thorough analysis of considerable evidence—both favorable and unfavorable to claimant. [DE 11 at 29]. In so doing, the ALJ built a logical bridge linking the evidence in the record to his conclusion. The ALJ's discussion of objective medical evidence accurately represented both positive and negative observations during mental status exams. [*See e.g.*, *id*.]. In discussing Mr. L's activities of daily living, the ALJ acknowledged Mr. L's testimony about his household activities as well as the stress and changes in routine that limited his ability to perform those tasks, including driving. [*Id.* at 26]. Mr. L suggests that his activities of daily living are limited further by other significant symptoms but does not clearly identify those symptoms.

As to conservative treatment, Mr. L contends that the ALJ improperly considered his decision to refuse medication and therapy treatment when assessing his subjective symptoms. Yet this is inconsistent with the regulations that explicitly include treatment as a factor the ALJ must consider. *See* 20 C.F.R. § 404.1529(c)(3)(iv)–(v); SSR 16-3p, 2017 WL 5180304, at *8–*9. And Mr. L suggests that fear of treatment can be a symptom of mental health impairments but does not show that fear affected Mr. L's treatment choices. In fact, the record—including Mr. L's testimony—shows that he made choices about his treatment for reasons other than fear, reasons the ALJ noted in his decision.

33

[*See* DE 11 at 26]. Thus, the ALJ complied with his obligation under SSR 16-3p to consider possible reasons for a claimant's failure to seek treatment. *See Deborah M. v. Saul*, 994 F.3d 785, 790 (7th Cir. 2021).

Mr. L's good work history is also accounted for the in the ALJ's opinion. Mr. L has not shown how the ALJ discounted his good work history in the decision. Mr. L simply notes his good work history and disputes the ALJ's conclusion about the intensity, persistence, and limited effects of his symptoms without connecting the two. Mr. L challenges the ALJ having found him not credible, but without acknowledging that credibility is no longer considered under SSR 16-3p.

Taken together, Mr. L has not shown that the ALJ's decision that he demonstrates a greater level of psychological function than he alleges is patently wrong. *See Deborah M.*, 994 F.3d at 791 (applying the "patently wrong" standard after credibility analysis was eliminated pursuant to SSR 16-3p). The ALJ has adequately explained his decision having taken into account the record and thoroughly documenting his consideration of significant favorable and unfavorable evidence.

In the end, the record before the ALJ was limited because Mr. L pursued limited formal medical treatment for his PTSD, especially once the COVID pandemic hit. Mr. L did not provide the ALJ with a medical opinion from any treating physician or psychologist that assessed his limitations as relevant to Social Security disability. The only evidence available to the ALJ opining about Mr. L's functional limitations was the agency opinions—Drs. Clark, Neville, and Gupta. Yet even those opinions were limited because they did not have the entirety of the record before them when examining Mr. L

or reviewing his records. Nevertheless, the ALJ credited Mr. L's own testimony about his limitations significantly adding limitations to the RFC to account for Mr. L's symptoms arising from his PTSD. Furthermore, the ALJ explained why he expanded the range of limitations opined by the State Agency consultants. Therefore, there is no need to disturb the ALJ's RFC determination without evidence showing greater functional limitations than those found by the ALJ. *See Heather T. v. Kijakazi*, CIVIL NO. 1:21cv291, 2022 WL 3355055, at *3–*4 (N.D. Ind. Aug. 15, 2022); *see also Taylor*, 2021 WL 6101618, at *3 (affirming ALJ's RFC determination noting that perhaps the ALJ crafted a more favorable RFC than the medical evidence would have permitted).

### C.    Step Five Analysis

In his January 2021 decision finding Mr. L not disabled under the Act, the ALJ conducted the requisite five-step analysis for evaluating claims for disability benefits. 20 C.F.R. § 404.1520. After finding Mr. L had not engaged in SGA since his alleged onset date, identifying Mr. L's severe impairments, finding that none of the severe impairments met or medically equaled a List, and defining an RFC for Mr. L, the ALJ concluded that Mr. L is unable to perform his past relevant work as an CNC programmer (DOT #609.262-010, SVP 5, sedentary), CNC operator (DOT #609.362-010, SVP 5, medium), supervisor (DOT #183.167-018, SVP 8, light as generally performed and heavy as actually performed). Accordingly, the ALJ moved on to Step Five to determine whether Mr. L could perform other work.

At Step Five, the burden of proof shifts to the Commissioner, who must "provid[e] evidence that demonstrates that other work exists in significant number in

the national economy that [the claimant] can do, given [his] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2); *see also Liskovitz v. Astrue,* 559 F.3d 736, 742-43 (7th Cir. 2009). ALJs typically enlist a vocational expert ("VE") to testify regarding which occupations, if any, a claimant can perform. *See* S.S.R. 83-12, 1983 WL 31253 (Jan. 1, 1983). VEs use information from the Dictionary of Occupational Titles ("DOT") to inform their assessments of a claimant's ability to perform certain types of work. SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000).

Here, the VE relied upon the DOT and his professional experience, and identified the representative occupations of laundry worker (DOT #361.685-018, SVP 2, medium), industrial cleaner (DOT #381.687-018, SVP 2, medium), and hospital cleaner (DOT #323.687-010, SVP 2, medium), which respectively have 30,000 jobs nationally, 80,000 jobs nationally, and 60,000 jobs nationally (170,000 jobs total), as jobs Mr. L could still perform with his RFC. Finding that Mr. L could make a successful adjustment to other work that exists in significant numbers in the national economy, the ALJ determined that Mr. L was not under a disability as defined in the Act. [DE 11 at 31].

Mr. L challenges the ALJ's decision arguing that his Step Five finding is not supported by substantial evidence. According to Mr. L, an accurate disability analysis would have found him limited to no more than sedentary work, which in turn would have implicated the Medical-Vocational Guidelines Grid Rule 201.14 requiring a finding of disability because of his age, education, and previous work experience. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 2.

36

"As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin,* 758 F.3d 850, 857 (7th Cir. 2014). While there is no "per se requirement" for an ALJ to use the specific terminology of "concentration, persistence, and pace" in a hypothetical, a court "will not assume that the VE is apprised of such limitations…." *Id.* In most cases, an ALJ "should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." *O'Connor-Spinner*, 627 F.3d at 620-21.

Additionally, the Seventh Circuit has held that limiting a claimant to "simple, routine tasks that do not require constant interactions with coworkers or the general public" may be insufficient to properly account for moderate limitations in concentrating, persisting, and maintaining pace. *Stewart v. Astrue,* 561 F.3d 679, 685 (7th Cir. 2009). In so doing, the Seventh Circuit has expressed concern that such boilerplate language will be used as a "one-size-fits-all solution without delving into an individual assessment of the claimant's specific symptoms." *Bruno v. Saul*, 817 F3d.Appx. 238, 242 (7th Cir. 2020) (citing *Martin v. Saul*, 950 F.3d 369, 373-74 (7th Cir. 2020)). In order to avoid such one-size-fits-all solutions, the Seventh Circuit has declined to "provide a glossary of adjectives for use in RFC determinations," and instead requires only that "the ALJ must account for the 'totality of a claimant's limitations' in determining the proper RFC." *Martin*, 950 F.3d at 374 (citing *Moreno*, 882 F.3d 722 at 730).

37

Here, the ALJ hypothetical included the nonexertional limitations that he identified in the step four analysis. [*Compare* DE 11 at 24–25, *with id*. at 86]. The ALJ developed these limitations from the opinions of the psychological consultants as well as the testimony of Mr. L. "It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation." *Flener ex rel. Flener*, 361 F.3d at 448. Adjusting the limitations to accommodate the concerns of the claimant is clearly appropriate. The ALJ created the necessary logical bridge in crafting an RFC with appropriate limitations, and this Court can find no error. *See Zurawski*, 245 F.3d at 889. Mr. L clearly wants this Court to reweigh the evidence and decide this matter de novo, which is clearly inappropriate. *See Young*, 362 F.3d at 1001; *Elder*, 529 F.3d at 413.

## IV.    CONCLUSION

For the reasons stated above, the ALJ's determination is supported by substantial evidence, includes no legal error, and does not warrant remand. Accordingly, the ALJ's decision, which was adopted by the Commissioner, is **AFFIRMED**. The Clerk is instructed to enter judgment in favor of the Commissioner.

**SO ORDERED** this 2nd of October 2023.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge